IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN


IN THE MATTER OF:


THE COMPLAINT OF CARPE DIEM
1969 LLC, AS OWNER AND EAST END
WATERSPORTS, LTD., d/b/a NAUTI
NYMPH POWERBOAT RENTALS, AS
OWNER PRO HAC VICE OF THE
NAUTI NYMPH #54 (hull identification          Civil No. 2017-56
number RJDU0003K112), ITS ENGINES,
TACKLE, APPURTENANCES,
EQUIPMENT, ETC., IN A CAUSE OF
EXONERATION FROM OR
LIMITATION OF LIABILITY,

Petitioners.


MEMORANDUM OPINION

Before the Court is "Petitioners' Motion for Partial Summary Judgment and Incorporated

Memorandum of Law" under Rule 56(a) of the Federal Rules of Civil Procedure.[1]  [ECF 80].

## I.     STATEMENT OF FACTS

Petitioners are Carpe Diem 1969 LLC, as owner, and East End Watersports, Ltd., d/b/a

Nauti Nymph Powerboat Rentals, as owner *pro hoc vice* (collectively "Carpe Diem"), of the Nauti

Nymph #54 (hull identification number RJDU0003K112) ("the vessel").  Comp. [ECF 1] at 1.

Claimants are Susan Graham and her husband, Michael Graham ("the Grahams").  Answer and

Claim [ECF 7] at 1.  Susan Graham is a college-educated school teacher.  S. Graham Dep. [ECF

80-1] at 2.[2]  On at least two occasions prior to the trip during which the incident at issue in this

_____

[1] On April 1, 2019, upon the parties' consent, the District Court referred the matter to the undersigned for all purposes.  [ECF 106].

[2] The page numbers given for citations to deposition transcripts are those of the ECF document, not those

case occurred, the Grahams chartered 30-foot vessels. *Id.* at 7-8. In the past, the Grahams owned

a pontoon and a 24-foot speedboat and would go boating "[a]pproximately three weekends out of

the month, weather permitting." *Id.* at 5, 8. On those occasions, Michael Graham captained the

boats. *Id.* at 8.

During the week of November 20, 2016, the Grahams vacationed with friends on St. John,

U.S. Virgin Islands. Answer and Claim [ECF 7] at 4. Previously, on August 23, 2016, Michael

Graham reserved two boats, plus a captain for each boat, from Carpe Diem. [ECF 80-3]. The

reservations were for day trips from St. John on November 23, 24, and 26, 2016. *Id.* The Grahams

leased the boats so that they could go swimming and visit the local beaches with their friends and

family. S. Graham Dep. [ECF 80-1] at 10; S. Graham Dep. [ECF 94-2] at 1.

On November 23, 2016, prior to departure, Captain Dan Conashevik gave the Grahams

and their guests a clipboard with a document to sign ("the release"). S. Graham Dep. [ECF 91-1]

at 18-19; M. Graham Dep. [ECF 91-1] at 30-31, 40-41; [ECF 80-5]. The release has print on just

over half of one page, followed by nine blank spaces for passengers to print and sign their names,

and provides as follows:

**<u>All Persons in Leasing Party Must Read and Sign Below</u>**

> In consideration of value received and the right to participate in the
> Activities, including but not limited to the use of the leased vessel
> and equipment including but not limited to masks, fins, skis, fishing
> gear, and snorkel equipment, provided by Lessor, the undersigned
> for himself, herself or itself, his/her/its heirs, successors, and
> assigns, does hereby release and forever discharge:
>
> > • East End Watersports Ltd. d/b/a Nauti Nymph Power Boat
> > Rentals ("Lessor"), and its affiliates, officers, directors,

---

of the transcript.

shareholders,    agents,    employees,    contractors, representatives, successors and assigns;

• Island Time Watersports, Inc., Ritz-Carlton (Virgin Islands), Inc., RC Hotels (Virgin Islands), Inc., Marriott International, Inc., The Ritz-Carlton Management Company, L.L.C., Great Bay Condominium Owners Association, Inc., The Neighborhood Association, Inc., The Ritz-Carlton Hotel Company, L.L.C., and their respective subsidiaries, parents, affiliates,    officers,    directors,    shareholders,    agents, employees, contractors, representatives, successors and assigns;

• Westin St. John Hotel Company, Inc., and its subsidiaries, parents, affiliates, officers, directors, shareholders, agents, employees, contractors, representatives, successors and assigns;

• Boat Owner, and its affiliates, officers, directors, shareholders, members, agents, employees, contractors, representatives, successors and assigns;

all of the above being collectively referred to as the "**RELEASED PARTIES**", from any and all manners of action, causes of action, suits, judgments, debts, damages, claims, liability, losses, costs, expenses and demands of any type or kind whatsoever that may arise on account of any reason or cause, injury or death, whatsoever, occurring from, connected with, related to or originating from the Activities.

Furthermore, each of the undersigned agrees to indemnify, defend and hold harmless and blameless each of the **RELEASED PARTIES** from and against any and all actions, liability, claims, suits, demands, damages, judgments, losses, costs and expenses, including attorneys' fees, to which any of the **RELEASED PARTIES** may be subject by reason of any claim for any injury to, or death of, any person or persons or for any damage to property or otherwise arising from, related to or in connection with the activity or activities described above.

The undersigned, for themselves, their heirs, executors, administrators, successors, and assigns agrees that in the event any claim for personal injury, property damage, or wrongful death shall be prosecuted against the **RELEASED PARTIES**, IT IS THE INTENTION OF THE UNDERSIGNED BY THIS INSTRUMENT

TO EXEMPT AND RELIEVE EACH AND ALL OF THE RELEASED PARTIES FROM LIABILITY FOR PERSONAL INJURY, PROPERTY DAMAGE, OR WRONGFUL DEATH WHETHER CAUSED BY THE NEGLIGENCE OF ANY OF THE UNDERSIGNED, ANY OF THE RELEASED PARTIES, THE VESSEL OWNER OR OTHERWISE ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH USE OF THE LEASED VESSEL, THE EQUIPMENT OR ANY OTHER ACTIVITIES RELATING TO THE SAME WHEREVER AND WHENEVER THEY MAY OCCUR.

**The undersigned are aware that the Activities are inherently dangerous activities and are voluntarily participating in these activities with knowledge of the danger involved. The undersigned hereby assume full responsibility for the risk of bodily injury, death or property damage arising out of or relating to the Activities whether caused by the negligence of the RELEASED PARTIES or otherwise.**

In further consideration for Lessor providing the vessel for Lessee's use for the Activities, the undersigned covenant not to bring any legal proceedings against Lessor, its affiliates, officers, directors, shareholders, agents, employees, contractors, representatives, successors, assigns and/or the United States Department of the Interior, the National Park Service and/or any agents and employees thereof, including but not limited to lawsuits, administrative proceedings or other claims or cross claims of any kind based upon personal injuries suffered in connection with any and all activities of any kind taking place on lands and/or waters of the Virgin Islands National Park, and the undersigned hereby release and discharge for all time any and all such claims that undersigned may have against Lessors, its affiliates, officers, directors, shareholders, agents, employees, contractors, representatives, successors, assigns and/or the United States Department of the Interior, the National Park Service and/or any agents and employees thereof arising in any way and at any time out of any and all such activities. The United States Department of Interior or the National Park Service and/or any directors, officers, employees or agents thereof are specifically intended to be third-party beneficiaries of this clause.

The undersigned each acknowledge that he or she has completely read this agreement, that he or she understands the potential dangers incidental to engaging in powerboating, and that he or she is fully aware of the legal consequences of signing this document. **Parents**

> **or legal guardians shall sign separately on behalf of themselves**
> **and each passenger who is a minor child.**

[ECF 80-5] (emphasis in original). Susan and Michael Graham signed a copy of the release on November 23, 2016; it covered both the November 23 and 24, 2016 charters. S. Graham Dep. [ECF 91-1] at 18-19; M. Graham Dep. [ECF 91-1] at 40-41; [ECF 80-5].

On November 26, 2016, again while the passengers were boarding their vessels, Captain Conashevik handed them a clipboard with another copy of the release to sign. S. Graham Dep. [ECF 91-1] at 26, 28. Both Grahams signed the release before departing St. John. S. Graham Dep. [ECF 91-1] at 28; M. Graham Dep. [ECF 91-1] at 42-43; [ECF 80-6]. That day, Susan Graham rode in Captain Conashevik's vessel, which first travelled from Cruz Bay, St. John (U.S. Virgin Islands) to Cinnamon Bay, St. John (U.S. Virgin Islands). [ECF 91-4]. The boats then started for West End, Tortola, intending to check into the British Virgin Islands with Customs and Immigration. *Id.* Susan Graham was injured after the vessel left Cinnamon Bay and was navigating a passage called the Narrows. *Id.*

On August 2, 2017, Carpe Diem filed the instant action for exoneration from or limitation of liability under 46 U.S.C. § 30501, *et seq*. ("the Limitation Act").[3] Comp. [ECF 1] ¶¶ 7, 14. The Grahams answered and asserted claims of simple negligence, gross negligence, and loss of consortium against Carpe Diem. Answer and Claim [ECF 7] at 6-7.

---

[3] Carpe Diem's "Complaint for Exoneration From or Limitation of Liability" sets forth an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure, the Supplemental Rules for Admiralty or Maritime Claims, and the Local Rules for the United States District Court for the Virgin Islands. Comp. [ECF 1] ¶ 1; Answer and Claim [ECF 7] at 1.

## II.      LEGAL STANDARDS

A.      <u>Summary Judgment Standard</u>

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that "irrelevant or unnecessary" factual disputes do not preclude summary judgment).  A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  "In considering a motion for summary judgment, a [] court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *N.H. Ins. Co. v. Diller*, 678 F. Supp. 2d 288, 295 (D.N.J. 2009) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)).

The movant has the initial burden of showing no genuine issue of material fact exists.  *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985).  Once the moving party meets this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 323; *see Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (stating that the non-moving party "may not rest upon mere allegations, general denials, or . . . vague statements"); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the nonmoving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

B.     Maritime Law

District courts of the United States "have original jurisdiction . . . of [a]ny civil case of . . . maritime jurisdiction."  28 U.S.C. § 1333(1).  Under 48 U.S.C. § 1612(a), the District Court of the Virgin Islands has the same "jurisdiction of a District Court of the United States."  Here, all the Grahams' claims are based on injuries sustained by Susan Graham while at sea.  In addition, the release Carpe Diem invokes in its defense is part of a maritime contract.   Therefore, the Constitution's Admiralty Clause brings the case within this court's jurisdiction.  *See Smolnikar v. Royal Caribbean Cruises, Ltd.*, 787 F. Supp. 2d 1308, 1315 (11th Cir. 2011) ("Federal maritime law applies to actions arising from alleged torts 'committed aboard a ship sailing in navigable waters.'"); *Piché v. Stockdale Holdings, LLC,* 51 V.I. 657, 662-63 (D.V.I. 2009) (holding that federal maritime law applied to plaintiff's claim that he was injured while a passenger on defendant's vessel).   The court applies substantive federal admiralty law to claims within the court's admiralty jurisdiction.  *Interested Underwriters at Lloyd's v. Haulover Marine, Inc.*, 866 F. Supp. 235, 236-37 (D.V.I. 1994).

C.     Law Relating to Liability Waivers in Maritime Cases

The Limitation Act "operates to shield from liability shipowners charged with wrongdoing committed without their privity or knowledge."  *Exxon Shipping Co. v. Baker*, 554 U.S. 741, 571 (2008).  As the District Court previously observed,

> the animating purpose of the Act:
>
> > was to encourage shipbuilding and to induce the investment of money in this branch of industry by limiting the venture of those who build the ships to the loss of the ship itself or her freight then pending, in cases of damage or wrong happening, without the privity, or knowledge of the shipowner, and by the fault or neglect of the master or other persons on board.

[ECF 85] at 3 (citing *Hartford Acc. & Indem. Co. of Hartford v. S. Pac. Co.*, 273 U.S. 207, 214 (1927)).

However, section 30509 of the Act, titled "Provisions limiting liability for personal injury or

death," provides:

> (a) Prohibition.—
>
>> (1) In general.—The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting—
>>
>> (A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or
>>
>> (B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

46 U.S.C. § 30509(a)(1).

Notwithstanding this prohibition in the Limitation Act, federal admiralty common law also

addresses liability waivers, and recognizes their enforceability under certain circumstances.

"Under admiralty law, an enforceable exculpatory clause must be (1) clear and unambiguous; (2)

[] not inconsistent with public policy; and (3) [] not an adhesion contract." *Olmo v. Atlantic City*

*Parasail, LLC*, 2016 WL 1704365, at *8 (D.N.J. 2016) (quoting *Cobb v. Aramark Sports & Entm't*

*Servs., LLC*, 933 F. Supp. 2d 1295, 1298 (D. Nev. 2013) (quotation marks omitted)); *accord*

*Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, 2013 WL 692471, at *5 (D.V.I. Feb.

26, 2013) ("[M]aritime recreational tour releases may bar ordinary negligence claims where the

release (1) clearly and unequivocally indicate[s] the intentions of the parties, and (2) [is not]

inflicted by a monopoly, or a party with excessive bargaining power.") (quotation marks omitted).

In making the enforceability determination, courts are to construe contracts according to the "plain meaning" rule of interpretation. *Delponte v. Coral World Virgin Islands, Inc.*, 48 V.I. 386, 389 (D.V.I. Aug. 14, 2006) (quotation marks omitted), *aff'd*, 233 F. App'x 178 (3d Cir. 2007). Thus, courts "assume[] that the intent of the parties to an instrument is 'embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'" *Sunshine Shopping Ctr. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000) (quoting *Hullet v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994)). Lastly, contracts must be viewed in their entirety: "all writings that are part of the same transaction are interpreted together." *Delponte*, 48 V.I. at 389 (quotation marks omitted).

## III. DISCUSSION

Carpe Diem seeks partial summary judgment as to Susan Graham's claim based on ordinary negligence and Michael Graham's loss of consortium claim derived from that claim. [ECF 80] at 2 n.1. Carpe Diem contends that these claims are barred by the release the Grahams signed prior to departing on the vessels on November 26, 2016. *Id.* at 2. The Grahams counter that the release is void under § 30509 of the Limitation Act. [ECF 91] at 1. Alternatively, the Grahams contend that (1) the release is ambiguous because it is part of another document, the "Conditions of Lease," which they were told did not apply to them; and (2) the release is unenforceable because they did not have an ample opportunity to read it before they signed it. *Id.* at 2.

A.      Section 30509 of the Limitation Act Does Not Void the Release

"[F]ederal courts applying maritime law hold that the prohibition on liability waivers [established in § 30509 of the Limitation Act] applies only to common carriers and that owners of recreational vessels may enforce such waivers." *Charnis v. Watersport Pro, LLC*, 2009 AMC

1299, 1305 (D. Nev. May 1, 2009); *accord Waggoner v. Nags Head Water Sports, Inc.*, 1998 WL

163811, at *5 (4th Cir. 1998).

Here, although Susan Graham's vessel travelled from the U.S. Virgin Islands to the British

Virgin Islands and back on November 26, 2016, it is undisputed that the Grahams were free to

chart the vessel's course and participate in the activities of their choosing.[4] As explained by Susan

Graham, she and her husband leased the boats not as a means of conveyance but to engage in

powerboating and other recreational maritime activities:

> Q.  And what were—what were—what did you do on the boats,
> just generally? What was the expectation?
>
> A.  Sightsee, you know, to look around for those that hadn't
> been. And then find fun lunch spots and spots to anchor to
> get in the water. Some snorkeling. Some beach, you know,
> just sitting on one of the beaches. And various locations that
> we had known from previous years where we asked to be
> taken. Sights for them to see, and restaurants.

S. Graham Dep. [ECF 80-1] at 12. That the Grahams had control over their itinerary is further

supported by Captain Conashevik's testimony, wherein he notes that after Susan Graham was

taken off the vessel, he took the remaining passengers to Jost Van Dyke at their request.

Conashevik Dep. [ECF 94-3] at 18. On this record, there is no genuine dispute that Carpe Diem

provided the Grahams and their guests with recreational vessels; Carpe Diem is not a common

carrier within the meaning of the Limitation Act. Thus, § 30509 of the Limitation Act does not

apply to preclude the enforcement of Carpe Diem's release. *See Jerome v. Water Sports Adventure*

*Rentals & Equip., Inc.*, 2013 WL 1499046, at *7 (D.V.I. Apr. 12, 2013) (holding that § 30509 does

not apply where plaintiff "was injured during a recreational jet ski and snorkeling tour"); *Oran v.*

---

[4] The release lists recreational equipment provided by Carpe Diem for the passengers' use as "including but not limited to masks, fins, skis, fishing gear, and snorkel equipment." [ECF 94-6].

*Fair Wind Sailing, Inc.*, 2009 WL 4349321, at *13 (D.V.I. Nov. 23, 2009) (holding that § 30509 does not apply because plaintiff was injured on "a recreational vessel used for sailing instruction purposes").

B.      The Release is Not Ambiguous

"A waiver is clear and unambiguous if it specifically bars the plaintiff's negligence claim and explicitly exonerates all defendants in the lawsuit." *Cobb*, 933 F. Supp. 2d at 1299. Conversely, a waiver "is ambiguous when reasonable people in the parties' positions could think that the contract has two reasonably alternative interpretations." *Delponte*, 2006 WL 2403331, at *2.

Here, the release is not ambiguous. First, the release appears in print and occupies one-half of one page. The heading on the page—"All Persons In Leasing Party Must Read and Sign Below"—is in bold and is underlined. Next, the language of the release itself, key portions of which are in capital letters or boldface or both, is extremely broad, demonstrating the parties' intent to shift the risk of liability for all claims, including ordinary negligence,[5] from Carpe Diem to the Grahams:

> . . . [the Grahams] . . . hereby release and forever discharge [Carpe Diem] from any and all manners of action, causes of action, suits, judgments, debts, damages, claims, liability, losses, costs, expenses and demands of any type or kind whatsoever that may arise on account of any reason or cause, injury or death, whatsoever, occurring from, connected with, related to or originating from the Activities.

* * *

---

[5]   Although Carpe Diem can seek to avoid liability for ordinary negligence through the use of a written waiver, it cannot do so for gross negligence. *See Charnis*, 2009 AMC at 1307 ("Under federal maritime law . . . owners of recreational boats may disclaim liability for negligence, but they may not do so for gross negligence. Gross negligence goes beyond ordinary negligence and is the willful, wanton or reckless infliction of harm.") (citation and quotation marks omitted).

[The Grahams] . . . agree[] . . . IT IS THE INTENTION OF THE [Grahams] BY THIS INSTRUMENT TO EXEMPT AND RELIEVE [Carpe Diem] FROM LIABILITY FOR PERSONAL INJURY . . . WHETHER CAUSED BY THE NEGLIGENCE OF [the Grahams], [Carpe Diem] . . . OR OTHERWISE ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH USE OF THE LEASED VESSEL, THE EQUIPMENT OR ANY OTHER ACTIVITIES RELATING TO THE SAME WHEREVER AND WHENEVER THEY MAY OCCUR.

**The undersigned are aware that the Activities are inherently dangerous activities and are voluntarily participating in these activities with knowledge of the danger involved. The undersigned hereby assume full responsibility for the risk of bodily injury, death or property damage arising out of or relating to the Activities whether caused by the negligence of the RELEASED PARTIES or otherwise.**

[ECF 80-5] (emphasis in original). This language unambiguously waives claims for "any and all" losses. Simply put, "there is no broader classification than the word 'all.'" *Oran*, 2009 WL 4349321, at *9 (quoting *Cole v. Ladbroke Racing Mich., Inc.*, 614 N.W. 2d 169, 176 (Mich. Ct. App. 2000) (quotation marks omitted) (applying Michigan law)); *accord Piché*, 51 V.I. at 668 (holding that the broad language of the liability waiver, which referenced "all . . . causes of action of whatever kind or nature . . . unambiguously evidences the parties' intent to exempt the defendants from liability for [plaintiff's] claims based on negligence, *res ipsa loquitur*, breach of contract, and breach of warranty").

Notwithstanding the foregoing, the Grahams appear to argue that the release is ambiguous because when the release and a document titled "Conditions of Lease" were given to Michael Graham to sign, Captain Conashevik told Michael Graham that he did not need to worry about reading the documents because they did not apply to him. [ECF 91] at 14. These contentions do not raise a genuine issue of fact that would render summary judgment inappropriate.

First, that the two documents may have been provided to Michael Graham at the same time does not render the language of the release ambiguous. Moreover, whatever Captain Conashevik may have told Michael Graham about reading any of the documents or their applicability is immaterial to Susan Graham's ordinary negligence claim. The claimants presented no evidence that Susan Graham heard or was a party to any conversations between Captain Conashevik and Michael Graham, or that Captain Conashevik ever told her not to read or worry about the release. Thus, claimants fail to raise a genuine issue regarding the clarity of the language in the release.

C.      Other Considerations in Determining Enforceability of the Release

Having found that the release is unambiguous, the Court must next address whether the release is inconsistent with public policy, is the product of a monopoly or excessive bargaining power or is an adhesion contract. Although the Grahams do not directly address these issues, they bear some discussion.

"[W]here the relationship between the parties does not involve an inherent risk of overreaching, an exculpatory clause may validly exempt a party from all liability for ordinary negligence." *Piché*, 2009 WL 799659, at *5; *accord Olmo v. Atlantic City Parasail, LLC*, 2016 WL 1728964, at *10 (D.N.J. Apr. 28, 2016) ("[U]nder admiralty law, exculpatory clauses waiving liability for negligence are consistent with public policy."); *Cobb*, 933 F. Supp. 2d at 1299 ("[W]aivers of liability on navigable waters do not contravene federal public policy."); *In re Aramark Sports & Entm't Servs., LLC*, 2012 WL 3776859, at *7 (D. Utah Aug. 29, 2012) (holding that "an exculpatory clause limited to barring liability for ordinary negligence would be valid, assuming it were not inflicted by a monopolist or one with greatly superior bargaining power."). Here, there is no evidence of overreaching. Further, despite its broad language, because the release

may be construed as disclaiming liability for only ordinary negligence, the release is not inconsistent with public policy.

In addition, this release is not a contract of adhesion or the product of monopoly power. "An adhesion contract is normally found to exist only within the context of a consumer's relation to a business or public enterprise." *Frederick v. Hess Oil Virgin Islands Corp.*, 492 F. Supp. 1338, 1341 (D.V.I. 1980). In *Sander v. Alexander Richardson Investments*, 334 F.3d 712, 720 (8th Cir. 2004), the United States Court of Appeals for the Eighth Circuit described the relationship as follows:

> It is not enough to assert that one party was less sophisticated than the other. There must be some evidence that the party holding the superior bargaining power exerted that power in overreaching the less sophisticated party by, for example, engaging in fraud or coercion or by insisting on an unconscionable clause.

In the context of federal admiralty law, "liability waivers for recreational sporting activities . . . are not [considered] contracts of adhesion because they are not essential services," *Cobb*, 933 F. Supp. 2d at 1299, "such as medical care or public transportation," *Olivelli v. Sappo Corp., Inc.*, 225 F. Supp. 2d 109, 119 (D.P.R. 2002). Here, there simply is no evidence that Carpe Diem had a monopoly on providing recreational boating excursions, or that Carpe Diem overreached a less sophisticated party. Carpe Diem's liability waiver relates to recreational boating, a nonessential service, and is therefore not voidable as a contract of adhesion.

It is undisputed that neither Susan nor Michael Graham read the release, although both signed a copy of it for the November 26, 2016 charter. According to the Grahams, they did not have a "reasonable opportunity to read the waiver before signing it." [ECF 91] at 11. Rather, they contend that Captain Conashevik gave them the release as they were boarding the vessels and pressured them to "hurry up because he had arrived late to pick them up." *Id.*

In *Delponte*, one of the issues on appeal was whether the plaintiff, who was injured while engaging in an underwater recreational excursion operated by Coral World, waived a claim for negligence by signing Coral World's waiver. 233 F. App'x at 179.  Significantly, the Third Circuit held that whether plaintiff read the waiver was irrelevant because he was given an opportunity to do so:  "Whether he read it or not, it was certainly provided for him to read." *Id.* at 180-81.  The *Delponte* court drew no distinction between plaintiff's having had an ample opportunity as opposed to simply an opportunity to read the waiver, nor will this Court.  Because the Grahams chose to lease vessels from Carpe Diem and were in control of their own itinerary, they could have informed Captain Conashevik that they needed additional time to review the release; they have proffered no evidence to the contrary.  Therefore, that Susan Graham signed the waiver without reading it does not, in and of itself, establish that the release is void. *See Wroblewski v. Ohiopyle Trading Post, Inc.*, 2013 WL 4504448, at *8-9 (W.D. Pa. Aug. 22, 2013) (holding that plaintiff's failure to read a liability waiver prior to being injured while participating in a voluntary white water rafting trip did not void the release) (applying Pennsylvania law); *see also Arce v. U-Pull-It Auto Parts, Inc.*, 2008 WL 375159, at *5-9 (E.D. Pa. Feb. 11, 2008) (holding that plaintiff's failure to read a liability waiver prior to being injured while on the premises of a junkyard did not invalidate the release despite the fact that the written release was in English and the plaintiff only read and spoke Spanish) (applying Pennsylvania law).

Next, to the extent that the Grahams' argument is that they were in an unequal bargaining position with respect to Carpe Diem, the facts do not support this contention.  Even if Captain Conashevik hurried the Grahams, they remained free to ask for additional time to review the documents but chose not to.  *See, e.g.*, M. Graham Dep. [ECF 91-1] at 33 ("I'm not here on a vacation to go ahead and read the fine print and pull out parts of a contract, or whatever it might

be called at that point in time while you've got 15 people sitting around."); *see also Olivelli v. Sappo Corp., Inc.*, 225 F. Supp. 2d 109, 119 (D.P.R. 2002) (holding that the decedent, a college-educated school teacher who "read and initialed every clause of the waiver, and was free to [choose not to take scuba diving lessons from defendant] if she did not wish to assent to the terms of the waiver" was not in an inferior bargaining position with respect to defendant).

D.     The Loss of Consortium Claim

Carpe Diem contends that Michael Graham's loss of consortium claim is not permitted under general maritime law. [ECF 80] at 15. According to Carpe Diem, in addition to precluding recovery for loss of consortium in actions involving seamen, courts—including those in the Virgin Islands—have prohibited such recovery in actions involving non-seamen. *Id.* at 16. The Grahams do not address this argument.

To date, the United States Supreme Court has not ruled on whether the spouse of a non-seaman may recover for loss of consortium under general maritime law. The Third Circuit, however, appears to recognize such a claim. *New York & Long Branch Steamboat Co. v. Johnson*, 195 F. 740, 741-42 (3d Cir. 1912) (holding that a loss of consortium claim is available to the spouse of a steamship passenger under federal admiralty law); *see also Morgan v. Almars Outboards, Inc.*, 316 F. Supp. 3d 828, 841 (D. Del. 2018) (and cases cited therein) (holding that a loss of consortium claim is available under general maritime law in common law negligence actions). In any event, the Court need not resolve that issue at this juncture. Michael Graham's loss of consortium claims are derivative of Susan Graham's negligence claims.[6] Thus, to the extent Susan

---

[6] *See Sevison v. Cruise Ship Yours, Inc.*, 37 V.I. 231, 235 (D.V.I. 1997).

Graham's ordinary negligence claim is precluded by the release, so, too, is Michael Graham's loss of consortium claim based on ordinary negligence.

In sum, Carpe Diem has satisfied its burden of demonstrating that there are no genuine issues of fact for trial with respect to the enforceability of the release. The release unambiguously reflects the parties' intent to exempt Carpe Diem from liability. Moreover, Carpe Diem did not possess excessive bargaining power, nor was it occupying a monopoly position relative to the Grahams. Nor was the release a contract of adhesion. The Grahams have failed to come forward with sufficient evidence to show otherwise. Accordingly, the Court will enforce the release to the extent it waives liability for Susan Graham's claim based on ordinary negligence, and Michael Graham's loss of consortium claim derived from Susan Graham's ordinary negligence claim.

## IV. CONCLUSION

For the reasons discussed above, the Court will grant Carpe Diem's motion for partial summary judgment. An appropriate Order follows.


**Dated**: July 29, 2019                    S\ _____
                                           **RUTH MILLER**
                                           United States Magistrate Judge